**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 26-cr-80050-DMM**

**UNITED STATES OF AMERICA,**
**Plaintiff,**

**vs.**

**HENRY PAUL DEMARCO,**
**Defendant.**
**___________________________________/**

# DEFENDANT'S SENTENCING MEMORANDUM

HENRY PAUL DEMARCO ("DeMarco") by and through his undersigned attorneys, respectfully submit his sentencing memorandum and moves this Honorable Court to sentence him within the advisory sentencing guidelines.

## INTRODUCTION

The defendant pled guilty to count one of the Indictment, charging interstate transmission of threat to injure in violation of 18 U.S.C. § 875(c).

The Presentence Investigation Report reveals that the defendant has a base offense level at 12 with a total offense level of 6. The defendant received -2 points for acceptance of responsibility and -4 points for specific offense characteristics due to the offense involving a single instance with little to no deliberation. The defendant has zero criminal history points and a criminal history category of I (Chapter Five, Part A.). Thus, the advisory guidelines range is 0-6 months. Probation did not identify any factors that warrant a sentence outside of the advisory guidelines while providing recommended standard and special conditions of a supervised release sentence.

Mr. DeMarco respectfully submits that a sentence of imprisonment is greater than is necessary to carry out the objectives of Title 18, United States Code, § 3553(a). Mr. DeMarco respectfully requests that this Honorable Court consider a sentence of no greater than three years of supervised release with standard and special conditions provided by Probation.

**ARGUMENT**

Mr. DeMarco seeks a sentence of three years of supervision which would include all conditions recommended by Probation on the basis of 1) the circumstances surrounding the offense that lead to the single out-of-character event, 2) his mental health and substance abuse issues that are a contributing factor to the offense, 3) the lack of deliberation to carry out the threat made, 4) the immediate acceptance of responsibility and show of remorse, 5) the significant steps that the defendant took, individually, to address all underlying issues and to contribute to the community in a positive manner, and 6) it being a sentence well within the sentencing guidelines .

In support of this sentence, Mr. DeMarco relies upon the Presentencing Investigation Report and the factors outlined in Title 18, United States Code, § 3553 (a). These factors establish that a sentence of no greater than three years of supervised release will achieve the purposes set forth in Title 18, United States Code,

§ 3553.

Title 18, United States Code, § 3553 provides in pertinent part:

**a) Factors To Be Considered in Imposing a Sentence.-** The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
**(2)** the need for the sentence imposed—
**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
**(B)** to afford adequate deterrence to criminal conduct;
**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

As of the time of the filing of this memorandum, the victim has not provided a victim impact statement.

**The circumstances surrounding the offense are relevant**

The circumstances surrounding Mr. DeMarco's conduct should be considered carefully in determining an appropriate sentence. Although Mr. DeMarco's inappropriate statement was wrong and should not be condoned, it occurred during an extraordinarily emotional and highly charged period following the assassination of Charlie Kirk, a young father whose murder was captured on live television, shocking the nation and generating intense public reaction. The timing and circumstances of the incident provide important context for understanding Mr. DeMarco's conduct and support a sentence of supervision alone.

Immediately following Mr. Kirk's death, the victim, while acting in his capacity as a school board official, made disparaging comments concerning Mr. Kirk. From the podium of a public-school forum, the victim compared the recently murdered Kirk to Adolf Hitler and labeled him a racist and bigot whom would not be missed.[1]

The remarks generated significant controversy and drew sharp criticism from different groups and members of the public, who accused the victim of engaging in hate speech. The victim subsequently received calls and emails from individuals throughout the county and across the state expressing their outrage and disgust with his comments. When asked whether he stood by what he

[1]Wayne Washington, *School Board member Edwin Ferguson rips Charlie Kirk, sparking Florida GOP ire,* Palm Beach Post, Sept. 19, 2025, https://www.palmbeachpost.com/story/news/education/2025/09/19/edwin-ferguson-tells-teachers-be-careful-discussing-racist-bigot-charlie-kirk/86219926007/

had said, the victim did not retract or qualify his remarks, but instead reiterated and "doubled down" on them.

The reaction was not limited to private communications. Protesters gathered outside the Palm Beach County School Board headquarters calling for the victim to be removed from his position. Outside local school board meetings, demonstrators held signs expressing support for Mr. Kirk. Protestors were quoted saying that they supported free speech but characterized the victim's remarks as "hate speech." Protestors also criticized the timing of the comments, stating: "You can't do that, you can't bash somebody, especially when the man was just assassinated. And come back a couple days later and speak ill about him, you can't do that."

The public reaction is relevant because it demonstrates that Mr. DeMarco's response did not occur in isolation. The victim's comments, the timing of those comments immediately following Mr. Kirk's assassination, the subsequent public criticism, the ethics complaints, the calls and emails received by the victim, and the demonstrations outside the school board headquarters all illustrate the extraordinary level of emotion and controversy surrounding the incident.

None of this excuses Mr. DeMarco's conduct and he accepts responsibility for his actions. The point, however, is not to justify his behavior, but to place it in its proper context when determining the appropriate sentence. This was not an incident arising from a longstanding plan or a calculated effort to carry out violence. It was also not because of the victim's race. It was a seconds long voicemail directed at an individual that made ill-timed comments, which occurred during a singular and exceptionally emotional event that had generated intense reactions throughout the community and across the country.

**Mental health and substance abuse contributed to the offense**

Mr. DeMarco's mental-health and alcohol abuse provide important context for the circumstances surrounding the offense. He had struggled with severe depression and anxiety for approximately twenty-three years and had been taking prescribed medication as part of his treatment for approximately twenty-one years. Over time, however, the medication began to cause his depression to significantly worsen and also began to experience many adverse health effects. As a result, Mr. DeMarco discontinued the medication, and he subsequently found it increasingly difficult to manage his depression with or without medication.

At the same time, Mr. DeMarco was adjusting to retirement and spending more time at home and alone. As his emotional difficulties continued, his alcohol use progressively increased. What began as drinking during a difficult period gradually developed into heavier alcohol use. By the time of the offense, Mr. DeMarco was no longer taking his medication, was struggling with depression and isolation, and was drinking heavily. He was under the influence of alcohol when he left the criminally charged voicemail.

The progression of these circumstances is important. Mr. DeMarco had a longstanding history of depression and had previously sought treatment for it. His decision to stop medication was not made casually; he stopped because he was experiencing adverse effects with worsening mental health issues that even included thoughts of suicide. Without effective treatment, his ability to manage his depression became more difficult, while his reliance on alcohol increased. These circumstances ultimately converged at the time of the offense and contributed to impaired judgment and emotional dysregulation.

Since the offense, Mr. DeMarco has taken meaningful steps to better understand and address the factors that contributed to his conduct. He consented to an in-depth risk assessment

conducted by Sheila Rapa, Psy.D., ATSAF, a Clinical and Forensic Psychologist. Dr. Rapa's evaluation provides important information regarding Mr. DeMarco's current risk and the conditions that can help prevent future problems.

Dr. Rapa concluded that her thorough evaluation did not support characterizing Mr. DeMarco as presenting a high risk of imminent physical violence. She found that the primary risk concern was narrower and more situational, involving a vulnerability to angry, impulsive, or verbally threatening communication under conditions of stress, perceived grievance, emotional dysregulation, or possible alcohol-related disinhibition.

Dr. Rapa ultimately assessed Mr. DeMarco's overall risk for imminent physical violence as low, provided that he remains compliant with court orders, has no contact with the alleged victim, avoids alcohol-related disinhibition, and participates in appropriate outpatient treatment.

These findings are particularly significant because the identified risk factors can be directly addressed through supervision. Conditions requiring Mr. DeMarco to remain compliant with court orders, participate in appropriate treatment, avoid alcohol, and have no contact with the alleged victim would provide structure and accountability while addressing the specific concerns identified by Dr. Rapa.

**There was no deliberation to carry out the threat made**

The lack of deliberation behind Mr. DeMarco's statement is an important mitigating circumstance that should be considered in determining the appropriate sentence. The evidence does not indicate that Mr. DeMarco developed a plan, took steps to carry out a threat, or engaged in sustained conduct directed toward causing physical harm. Rather, it was made during a single incident and was not accompanied by any demonstrated effort to act upon it.

This distinction was expressly recognized in the Presentence Investigation Report. Probation reduced Mr. DeMarco's base score by four points because the incident was a single event and there was no deliberation to carry out the threat. That substantial reduction reflects the absence of planning or purposeful steps toward execution and distinguishes Mr. DeMarco's conduct from a case involving a calculated or sustained threat of violence.

**Defendant immediately took responsibility and apologized to the victim**

Mr. DeMarco immediately accepted responsibility for his actions. Rather than attempting to avoid accountability, he voluntarily travelled to Florida and self-surrendered to law enforcement, and acknowledged the seriousness of what he had done. He also took the additional step of writing directly to the victim, through Probation and the United States Attorney's Office, to express his sincere remorse and apologize for the fear and anxiety his actions caused the victim and his family.

In his letter, Mr. DeMarco did not attempt to minimize or justify his conduct. He expressly acknowledged that leaving the voicemail was wrong and accepted full responsibility for his actions. He also recognized that his intoxication did not excuse what he had done, stating:

> "Although I never intended to cause any harm, I accept full responsibility for my despicable actions in leaving a threatening voicemail. While this was done while under the influence of alcohol, it is certainly not an excuse or defense."

Mr. DeMarco further described his own reaction to his conduct, explaining that he was "deeply ashamed, sickened, and embarrassed" because what he had done was "completely inappropriate and out of character." He concluded his letter by expressing that he was "deeply sorry and extremely remorseful."

Mr. DeMarco's conduct following the offense is significant. His immediate surrender, acceptance of responsibility, and unsolicited expression of remorse demonstrate that he understood the seriousness of his actions and did not require the Court to force him to acknowledge them. His apology also demonstrates an awareness of the impact his conduct had on the victim and the victim's family.

**Defendant took significant steps to address contributing underlying issues and give back to the community**[2]

Mr. DeMarco has taken significant and sustained steps to address the underlying issues that contributed to the offense and to make meaningful changes in his life. Importantly, he has taken these steps on his own initiative. His efforts are not limited to statements of remorse or compliance with court requirements. Since the offense, he has independently made concrete changes to address his alcohol use, emotional regulation, mental health, and overall well-being.

Most importantly, Mr. DeMarco has abstained from alcohol since October 11, 2025. He made the decision to stop drinking on his own and has maintained his sobriety without waiting for a court order requiring him to do so. He has consistently attended Alcoholics Anonymous meetings approximately twice each week and has worked through the twelve-step program with his sponsor, Mr. J.J. Bremner, CACII, CCS, a certified addiction counselor. Mr. DeMarco has received documentation of his completion of the twelve-step program and has continued meeting regularly with his sponsor, including participation in weekly men's meetings. He has also received eleven A.A. sobriety chips recognizing his continued sobriety. In addition, he has provided multiple

[2] *See generally* Psychological Evaluation and Risk Assessment; Letters of Support from Bryan J. DeMarco, M.D., and Thomas J. DeMarco, M.D.; North Georgia Counseling Services Assessment Summary; North Georgia Counseling Services Anger Management Letter of Completion; North Georgia Counseling Services Progress Report; North Georgia Counseling Services Drug and Alcohol Test Results (Nov. 13, 2025; Nov. 20, 2025; Feb. 3, 2026; Apr. 22, 2026; June 17, 2026; and July 9, 2026, Aug. 27, 2026); Proof of Volunteer Hours (June and July letters); and Receipt of Firearms Sold.

negative urine drug and alcohol screens to Probation and the United States Attorney's Office as documentation of his commitment to remaining sober.

Mr. DeMarco has also independently addressed anger management and emotional regulation. He completed a nine-week anger management therapy course with Tracey Messer, CACI, CAMSII, CGS, of North Georgia Counseling Services, and received a certificate of completion. He undertook this treatment voluntarily because he recognized the need to better understand and control the emotional factors that contributed to his conduct. These efforts demonstrate that he has not simply identified alcohol as a problem; he has actively worked to address the emotional and behavioral issues associated with the offense.

He has also made meaningful changes to his daily life without being directed to do so by the Court. Mr. DeMarco has reconnected with his Christian faith and regularly attends church. He has deliberately reduced his exposure to news and current-events coverage because he recognizes that controversial subjects can contribute to depression, anxiety, and emotional triggers. Instead, he has focused his time on self-improvement, family, physical fitness, and maintaining a healthier lifestyle. He has been exercising regularly, improved his diet, and learned to live without alcohol.

Perhaps most importantly, Mr. DeMarco has sought to turn a difficult experience into an opportunity to give back to others. Through his church, he volunteers with the Society of St. Vincent de Paul, assisting with food-supply deliveries to families in need in his community. The organization provides food to approximately thirty to fifty families each month without requiring payment or church attendance from those receiving assistance. Mr. DeMarco chose to devote his time to helping families in need as part of his own effort to become a better person, friend, brother, and citizen.

Mr. DeMarco's efforts are particularly meaningful because they demonstrate that he is taking responsibility for the circumstances that contributed to the offense rather than simply waiting for the Court to impose conditions upon him. Before being sentenced, he had already begun the work of rehabilitation. He independently pursued sobriety, counseling, anger-management treatment, spiritual renewal, improving physical health, and community service. He has preserved documentation of all of these efforts and has provided them to Probation and the United States Attorney's Office.

His conduct since the offense is consistent with the conclusion that the incident was an aberration rather than a reflection of his character. For much of his adult life, Mr. DeMarco worked in medical sales and business development, ultimately building and operating his own business before retiring. He has a history of professional achievement, responsibility, and service to others. He was raised in a family where respect for others was emphasized, and he has lived and worked in diverse environments throughout his career. His family has also provided character references addressing the fact that this incident was out of character and identifying the support they will provide going forward.

Mr. DeMarco's post-offense conduct demonstrates a genuine commitment to ensuring that this incident is never repeated. He has already implemented the very safeguards that would be central to a successful period of supervision: sobriety, treatment, accountability, avoidance of known triggers, emotional regulation, spiritual support, and community involvement. He intends to continue counseling, substance-abuse treatment, A.A. participation, and community service well into the future.

These efforts are significant because Mr. DeMarco is not asking the Court to simply trust that he will change. He has already begun changing, voluntarily and without being ordered to do

so. He has maintained sobriety, completed treatment programs, participated in ongoing recovery, submitted to testing, reconnected with his faith, changed his exposure to triggering media, improved his physical health, and dedicated time to helping others.

A sentence of supervision would allow Mr. DeMarco to continue this progress while remaining accountable to the Court. Rather than interrupting the rehabilitation that is already underway, supervision can reinforce it through continued treatment, sobriety, monitoring, and community involvement. His extensive post-offense efforts, all initiated voluntarily, provide a strong foundation for successful supervision and support the conclusion that incarceration is unnecessary to achieve rehabilitation, accountability, or public safety.

**A sentence of supervision is within the sentencing guidelines**

A sentence of three years of supervision is reasonable and falls well within the range contemplated by the applicable sentencing guidelines. According to the Presentence Investigation Report, Mr. DeMarco received a total score of six points, which corresponds to a guideline range of zero to six months of incarceration. The guideline framework also contemplates a minimum sentence of one year of supervision with no term of incarceration, while the maximum recommendation may include up to six months of incarceration followed by a period of supervision. In that context, a three-year term of supervision is a measured and appropriate sentence.

Mr. DeMarco's score of six points reflects significant consideration of the circumstances surrounding the offense and his conduct thereafter. He received a two-point reduction for acceptance of responsibility, demonstrating his willingness to acknowledge his conduct and accept the consequences of his actions. He also received a four-point reduction because the incident involved a single event and there was no deliberation or planning to carry out the threat. These

reductions recognize important mitigating circumstances and distinguish this conduct from a more calculated or sustained offense.

A three-year term of supervision appropriately balances the seriousness of the offense with the significant mitigating factors present in this case. It provides a substantial period during which Mr. DeMarco can remain accountable to the Court and comply with conditions designed to promote lawful conduct, while avoiding the more severe consequences of incarceration. Given that the guideline range begins at zero months of incarceration with one year of supervision, three years of supervision is a fair, proportionate, and reasonable sentence.

## CONCLUSION

For the reasons stated above, Mr. DeMarco respectfully requests that this Honorable Court to impose a sentence within the guidelines of no greater than three years of supervised release with a reasonable fine.

Respectfully submitted by:
MICHELLE R. SUSKAUER, ESQ.
The Suskauer Law Firm P.A.
515 N. Flagler Drive Suite 350
West Palm Beach, Florida 33401
(561) 687-7866
Michelle@Suskauer.com

By: /s/MICHELLE SUSKAUER
MICHELLE R. SUSKAUER, ESQ.
Fla. Bar No. 0908230

Respectfully submitted by:
TYLER DIMAIO, ESQ.
The Suskauer Law Firm P.A.
515 N. Flagler Drive Suite 350
West Palm Beach, Florida 33401
(561) 687-7866
Tyler@Suskauer.com

By: /s/TYLER DIMAIO
TYLER DIMAIO, ESQ.
Fla. Bar No. 118169

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2026, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record on the attached service list in the manner specified, either via transmission or Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel of parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/MICHELLE SUSKAUER
Michelle Suskauer, Esq.

By:/s/ TYLER DIMAIO
Tyler DiMaio

**SERVICE LIST**

Juan A. Albino, Assistant U.S. Attorney
500 S. Australian Ave., #400
West Palm Beach, FL 33401
561-209-1009
Attorney for Plaintiff USA
Served through CM/ECF

Trevor Bush
United States Probation Officer
Flagler Center Building
501 South Flagler Drive, Suite 400
West Palm Beach, FL 33401
561-804-6897

SHEILA K. RAPA
PSYD, PA
Clinical and Forensic Psychologist
2880 Oakland Park Blvd, Suite 116
Oakland Park, Florida 33311
Telephone: (954) 684-9406
Email: DrSRapa@DrSRapa.com

# PSYCHOLOGICAL EVALUATION AND RISK ASSESSMENT

## IDENTIFYING INFORMATION

**Name of Defendant:** Henry Paul DeMarco **Date of Birth:** 3/28/1961 (65)
**Attorney:** Tyler DiMaio, Esq. **Evaluator:** Sheila K. Rapa Psy.D.
**Dates of Evaluation:** 5/22/2026 **Date of Report:** 6/5/2026

**IDENTIFYING INFORMATION/REASON FOR REFERRAL**: Mr. Henry Paul DeMarco is a 65-year-old male. He was referred by Attorney Tyler DiMaio for a psychological evaluation and risk assessment as part of criminal legal proceedings against him. He was arrested and charged federally with interstate transmission of a threat to injure for allegedly leaving a voicemail message threatening a member of the Palm Beach County School Board.

**NOTIFICATION:** Mr. DeMarco was informed of the nature and purpose of the evaluation and the potential limited confidentiality of the report. He acknowledged an understanding of the information presented by the evaluator and was able to summarize the relevant points of this information. He was provided an opportunity to ask questions regarding the evaluation and evaluation process. He indicated his willingness to proceed, considering the limits of confidentiality.

**DISCLAIMER:** The information presented in this evaluation is to notify the reader of the information reported to this evaluator by Mr. DeMarco, the records reviewed, as well as any testing conducted, and not necessarily to affirm the veracity or truthfulness of case historical information. Similarly, the findings and conclusions in this evaluation are based on the information available to this evaluator at the time. Therefore, should new information become available, they are subject to change. Additionally, this evaluator's role was limited to conducting a forensic psychological evaluation of Mr. DeMarco. This evaluator did not provide psychotherapy, treatment, or ongoing clinical services to Mr. DeMarco, and no treating therapist–patient relationship was implied or established.

## RECORDS REVIEWED

AA/PC Affidavit
FBI FD-302, Initial Report
Character Reference Letter (Thomas DeMarco, M.D.)
Character Reference Letter (Bryan DeMarco, M.D.)
Apology Letter to Victim
Medical Records, Emory Heart & Vascular clinic, 2010-2026
Criminal History Record, Georgia Crime Information Center/NCIC
Riviera Beach Police Department / idiCORE Comprehensive Report

## PSYCHOLOGICAL TESTING

Clinical Interview/Mental Status Examination (MSE)
Collateral Interview (Brother, Bryan DeMarco, M.D.)
Minnesota Multiphasic Personality Inventory–3 (MMPI-3)
Miller Forensic Assessment of Symptoms Test (MFAST)
State-Trait Anger Expression Inventory, Second Edition (STAXI-2)
Historical-Clinical-Risk Management-20, Version 3 (HCR-20V3)

## BRIEF SOCIAL HISTORY

Mr. DeMarco was born and raised in Hartford, Connecticut. He described his family as Catholic and reported that he is the youngest of six children, all born to the same parents. His siblings include two older brothers and three older sisters. His brothers, Bryan and Thomas, are physicians and live in Georgia. Mr. DeMarco reported that his brothers are currently among his closest sources of support. He described them as *"my rock"* and stated that he has informed them about the present situation. He described himself as more likely to rely on his brothers emotionally, while attempting to be a strong support to his sisters.

Mr. DeMarco described his father as a World War II veteran who immigrated from Italy in 1932. He stated that his father lost his own father in 1935 and grew up in the context of the Great Depression. Mr. DeMarco reported that his father worked for Pratt & Whitney for approximately 33 years and retired at age 62. He stated that his father died in 2009 at the age of 84. Mr. DeMarco reported that his father had a history of depression and anxiety and described him as a man who carried a great deal of unresolved anger. He stated that his father could be emotionally abusive and yelled at the children. Mr. DeMarco denied any physical abuse by his father, but stated that his father had *"a lot of rage."* He also reported that his father could be verbally abusive toward his mother and that his parents' relationship was conflictual.

Mr. DeMarco described his mother as a registered nurse who worked in private duty nursing in Connecticut and later at Jupiter Medical Center in Florida. He reported that she retired at age 62. He did not report any mental health or substance-use problems in his mother. He described both parents as social drinkers and stated that neither generally overindulged, although later collateral information from Mr. DeMarco's oldest brother, Dr. B. DeMarco, indicated that their father drank more heavily during a stressful period surrounding the family's move to Florida. Mr. DeMarco denied abuse by his mother and described her as someone who handled family stress better than his father. He stated that his parents stayed together and did not believe in divorce, but he experienced them as *"good parents to us"* while also stating that they were *"not good together as husband and wife."*

Mr. DeMarco reported that the family moved to Florida when he was approximately 15 years old due to his father's work with Pratt & Whitney. He stated that he was the only child who moved with his parents to Florida, as his siblings were already older and more independent. He described this as a stressful and isolating transition because he was exposed more directly to the conflict between his parents. He stated that when he was in college, he felt he needed to get out of the house because of their relationship. He reported that, around 1981, he contacted a friend who had an extra room available and rented a room away from the family home.

Dr. B. DeMarco, Mr. DeMarco's brother, provided collateral information regarding the family background. Dr. B. DeMarco explained that he is the oldest sibling, followed by Thomas, then the sisters, and then Paul. He confirmed that the family is originally from Hartford, Connecticut, and that Mr. DeMarco moved to Florida with their parents when he was about to start high school. Dr. B. DeMarco noted that there was a nine-year age difference between himself and Mr. DeMarco and that by the time he went to college, Mr. DeMarco was still in elementary school. He stated that both of the older brothers eventually came to Atlanta for work, while Mr. DeMarco later moved to Atlanta in approximately 1990 and has remained in Georgia since that time.

Dr. B. DeMarco described Mr. DeMarco as *"a very social and friendly guy,"* and also described him as kind and considerate. He stated that he and Mr. DeMarco have had a very good relationship and that they live approximately 15 minutes away from one another. He reported that they have seen each other weekly since the mid-1990s. Dr. B. DeMarco described Mr. DeMarco as bright, socially connected, and without known developmental, learning, behavioral, or social problems during childhood. He reported that Mr. DeMarco was a good student, participated in football, scouts, and sports, and generally got along well with others. He described their parents as supportive, while also noting that their

father had significant anxiety and anger, and that the move to Florida was difficult for Mr. DeMarco.

According to Dr. B. DeMarco, the move to Florida was especially challenging because Mr. DeMarco was the only sibling who moved with their parents. Dr. B. DeMarco stated that their father had pressure and anxiety, was overprescribed Xanax, and had anger issues. He stated that the older brothers *"had it worse,"* and that their father was somewhat more mellow by the time Mr. DeMarco was younger, but that the family conflict was still significant. He described the parents as fighting often during that period. He also reported seeing their father *"pretty drunk"* on a couple of occasions and stated that their father drank heavily for a few years before eventually coming out of that period.

Mr. DeMarco reported that after college he returned to Connecticut and stayed with one of his sisters for a period of time. He later moved to Atlanta in 1990 and has lived in Georgia since. Mr. DeMarco also reported a continued fondness for Florida and stated that he has made many trips there in recent years.

Mr. DeMarco reported a period of marital difficulty beginning around 2003. He stated that he was married for approximately five years and that the relationship lasted approximately seven years overall. He reported that he and his former wife remain friends. He stated that they had no children by choice. He described his former wife as having a history of childhood sexual abuse and reported that his own depression contributed to the end of the marriage. He also described himself at that time as working extensively.

Dr. B. DeMarco also commented on Mr. DeMarco's relationship history. He did not describe a history of domestic violence, chronic relationship instability, or interpersonal intimidation. He specifically stated that, to his knowledge, Mr. DeMarco has never physically assaulted anyone, made credible threats, destroyed property, stalked, harassed, or intimidated others. He also denied knowledge of domestic violence, workplace threats, road rage, bar fights, neighbor disputes, or police calls involving anger or threats.

Mr. DeMarco described himself, currently, as increasingly selective about what media he consumes. He stated that he stopped watching news and political media and now watches YouTube and nature channels. He stated, *"What you bring in through your mind and computer is what you will feel."* He reported that he no longer watches political content and wants to *"live in peace and harmony."* He also described himself as driven and as having positive personal qualities.

Mr. DeMarco reported involvement with St. Vincent de Paul through church-related service. He stated that he has delivered food to families in need and had also worked at a thrift store, although he reported that the thrift-store

work became difficult because of knee pain. He reported that he expects to see another orthopedic surgeon and believes he may need additional surgery.

Dr. B. DeMarco described Mr. DeMarco as helpful within the family, including being helpful to a sister in Georgia who moved closer to the brothers so they could provide more support. He stated that the family remains available to Mr. DeMarco and that two brothers, a sister, and their families live nearby. Dr. B. DeMarco reported that the family has the ability and willingness to support Mr. DeMarco if needed. He stated that Mr. DeMarco is economically self-sufficient, but that the family has sufficient means and willingness to assist him if a need arises.

Dr. B. DeMarco expressed strong confidence in Mr. DeMarco's ability to be safely managed in the community with appropriate support. He stated that he and the family are available to monitor Mr. DeMarco's mood, alcohol use, stress level, online behavior, and compliance with no-contact expectations. He stated that if he observed warning signs, he would consult with Mr. DeMarco's treatment team. He also stated that Mr. DeMarco has expressed significant regret and willingness to obtain help, and that the family is prepared to support him in following through with treatment and any necessary safeguards.

## EDUCATIONAL HISTORY

Mr. DeMarco reported that he began his education at St. Gabriel's, where he attended first and second grade. He then attended public school in Windsor, Connecticut for most of his elementary and secondary education. Midway through the 10th grade, his family moved to Florida due to his father's employment. Mr. DeMarco reported that his mother had concerns about drug activity at Jupiter High School, so he was instead enrolled at Cardinal Newman High School. He remained at Cardinal Newman from the latter part of 10th grade through 12th grade and graduated in 1979.

Mr. DeMarco described himself as a social student rather than a particularly strong academic student during high school. He reported that his grades were generally in the C range. After high school, he attended St. Leo College in Pasco County for one year. He reported that he did not do well academically during that period, explaining that he had difficulty concentrating and was more socially focused at the time.

After leaving St. Leo College, Mr. DeMarco returned home and attended Palm Beach Junior College beginning that summer, with the goal of eventually transferring to the University of Florida. He reported that he attended Palm Beach Junior College from approximately June through December, but did not accumulate enough credits to transfer as planned. He later attended Florida

State University, where he earned a Bachelor's degree in Political Science and Government in 1986. He reported participating in Sigma Phi Epsilon Fraternity while at Florida State.

In July 2017, Mr. DeMarco obtained a Lean Six Sigma Yellow Belt certification. This certification reflects basic training in business process improvement, efficiency, waste reduction, and quality-control concepts.

**EMPLOYMENT AND FINANCIAL HISTORY**

Mr. DeMarco reported that he worked throughout college and helped support himself through a combination of employment and student loans. During that period, he worked in service-industry jobs, including waiting tables, tending bar, and shucking oysters. After college, Mr. DeMarco began his professional career with Forest Laboratories, where he worked for approximately one and a half years. He reported that he was later contacted by a headhunter regarding a position with MetPath, a New York-based laboratory company that he described as similar to Quest or Labcorp. He accepted the position and was eventually transferred to Boston for that job when he was approximately 25 or 26 years old.

Mr. DeMarco later left that position and moved to Atlanta where he worked for Labcorp and then SmithKline Beecham. He was involved in employee testing and work connected to a NIDA-certified laboratory. He described SmithKline Beecham as a strong company and stated that his career "took off" during this period. He later moved into the clinical side of the business, won President's Club three times over approximately ten years, and was promoted to Area Business Manager. He described this as a time when he was flourishing professionally.

Mr. DeMarco reported that in late 1999 it was announced that Quest had purchased SmithKline Beecham. He stated that, as part of that transition, his stock options were taken, and he left the company in approximately 2000 after about ten years of employment.

In approximately 2001, Mr. DeMarco started Corporate Testing Solutions, Inc., a pre-employment drug-testing business. He described the company as a thriving business that operated from approximately 2001 until 2013. He reported that he sold the business to his business partner in 2013.

After selling the business, Mr. DeMarco returned to clinical laboratory sales for several years. Available employment information reflects a lengthy background in business development, sales, and healthcare-related consulting. From approximately 2009 to 2015, he worked as a Senior Sales Executive with Solstas Lab Partners, where his responsibilities reportedly included selling pathology and

clinical laboratory diagnostic testing services to hospitals and medium-to-large physician practices. From 2015 to 2016, he worked as a Senior Sales Executive with Molecular Testing Labs, a start-up genomics laboratory based in Vancouver, Washington, where he was reportedly one of a small number of business-development executives hired nationally for direct-to-provider sales.

From 2016 to 2018, Mr. DeMarco served as Director of Business Development with Intalere, an Intermountain Healthcare company formerly associated with Amerinet. In that role, he was reportedly responsible for organic growth and ongoing advising related to healthcare supply-chain services for more than 1,400 alternate-care sites, with sales volume reportedly exceeding $60 million. From 2018 to 2019, he worked in Business Development Consulting Sales with Quorum Health Resources in hospital management. His stated focus in that position was assisting hospitals and health systems with financial, operational, and strategic improvement to support long-term sustainability, including work with C-suite executives through a consultative sales model.

Mr. DeMarco described his later sales and business-development roles as high-pressure positions. He reported having a million-dollar sales quota and stated that people were terminated if they did not meet expectations. He characterized the work as *"high stress"* but also *"high reward."* He reported that, after returning to clinical laboratory sales, the stress eventually became difficult for him to sustain. In approximately 2020, he decided he was "done" and retired.

## SUBSTANCE USE HISTORY

Mr. DeMarco reported that his alcohol use increased substantially during the year preceding the present evaluation. He described this increase as occurring in the context of retirement, boredom, limited structure, depression, and changes in his antidepressant medication. He stated that he was reducing his Zoloft while increasing his alcohol intake. He reported that he would drink alone in his office and estimated that, during that period, he was consuming approximately eight to nine beers nightly.

He described himself as bored, without enough hobbies or structure, and depressed. He reported that he did not drink and drive, stating that he drank at home and used DoorDash rather than driving after drinking. He acknowledged that he was drinking excessively and was depressed when he left the message involved in the instant offense.

Mr. DeMarco also reported some marijuana use, though he stated this was not recent. He estimated that his marijuana use had been approximately once per week at times and acknowledged that when he combined marijuana with alcohol, he became more intoxicated.

Mr. DeMarco reported that he has been sober since late 2025. He stated that he began attending Alcoholics Anonymous and has been working with “JJ” Bremner, whom he described as a certified addiction counselor, his AA sponsor, and a trusted friend. Mr. DeMarco reported that JJ has guided him through the AA 12-step program, which he recently completed. Mr. DeMarco showed this evaluator his certificate of completion. He stated that JJ also provided a letter on his behalf and would likely be open to answering questions related to Mr. DeMarco’s recovery efforts. Mr. DeMarco reported that he attends men’s meetings weekly at a church near him and described the recovery process as involving humility, reducing ego and selfishness, and maintaining accountability. He also reported that alcohol and drug screens have been negative.

Dr. B. DeMarco provided collateral information regarding Mr. DeMarco’s alcohol use and recent functioning. He reported that Mr. DeMarco hid the extent of his alcohol use from the family. Dr. B. DeMarco observed Mr. DeMarco drinking three to four glasses of wine at Thanksgiving and later learned that Mr. DeMarco had been drinking more heavily. He stated that Mr. DeMarco had been trying to handle his problems on his own and had been self-medicating with alcohol. Dr. B. DeMarco also noted possible family and social-modeling factors, including their father’s history of heavier drinking during a stressful period and other relatives who have struggled with alcohol use or addiction.

Dr. B. DeMarco described Mr. DeMarco’s increased alcohol use as occurring alongside depression, medication changes, and efforts to taper off SSRI medication. He reported that Mr. DeMarco came off SSRI medication abruptly and against medical advice, tried other medications through his primary care provider, and appeared to worsen emotionally during that period. According to Dr. B. DeMarco, these medication and mood-related difficulties appeared connected to Mr. DeMarco’s increased drinking.

By the Thanksgiving and Christmas holiday period in 2025, Dr. B. DeMarco observed that Mr. DeMarco seemed to be doing better and that his weeping had decreased. Mr. DeMarco’s current self-report is that he has remained sober since October 2025, has engaged in AA, has completed the 12 steps with his sponsor, and intends to maintain sobriety going forward.

## MEDICAL AND MENTAL HEALTH HISTORY

Mr. DeMarco reported a history of depression and anxiety dating back many years. He stated that his depressive symptoms became more prominent around the time of his divorce in approximately 2003, during which he was also starting a business. He reported experiencing panic attacks while driving during that period and began psychiatric treatment. He was initially prescribed Prozac, which he reported he did not tolerate well. He later saw another psychiatrist and tried a different medication, which he also described as ineffective. By approximately

2005, he began receiving medication management through his primary care provider and was prescribed Zoloft and other SSRI medications.

Mr. DeMarco reported that he has taken Zoloft off and on for many years, including at a dosage of approximately 200 mg per day. He stated that within the past year he was no longer feeling as well on the medication. He described worsening depression, increased crying, fear, anxiety, and weeping. He also reported difficulty tolerating the medication, including insomnia, irritability, and sexual dysfunction. He stated that he attempted to reduce his Zoloft and, during that same general period, his alcohol use increased. He reported that approximately two weeks prior to the evaluation, his medication was changed to Cymbalta, which he identified as being prescribed for depression and anxiety.

Mr. DeMarco reported that his depressive symptoms eventually reached a point where he felt he *"couldn't carry it"* by himself anymore. He acknowledged having thoughts of suicide, but denied having a suicide plan. He stated that he has had suicidal thoughts *"off and on"* throughout his life, though he described the more recent period as worse than prior episodes. He also reported worry and nightmares related to the present situation. He denied psychotic symptoms.

Mr. DeMarco reported receiving counseling through North Georgia Counseling Services with Tracey Messer. He stated that he also completed anger-management work with Ms. Messer and he showed this evaluator a certificate of completion. His mental health history, as described by him, includes longstanding depression and anxiety, intermittent suicidal ideation without reported plan, periods of panic, irritability, and more recent worsening symptoms in the context of medication changes, retirement, increased alcohol use, and legal stress.

Collateral information from Dr. B. DeMarco, Mr. DeMarco's brother, was consistent with Mr. DeMarco's report of depression and medication-related difficulties. Dr. B. DeMarco stated that Mr. DeMarco's depression appeared to begin around the time of his divorce in the late 1990s or early 2000s. He recalled that Mr. DeMarco had been treated with SSRI medication, approximately 15 to 20 years earlier. Dr. B. DeMarco reported that he felt Mr. DeMarco's anger and irritability were related to his depression and that he sought counseling. Dr. B. DeMarco emphasized that, in ordinary situations, Mr. DeMarco has not been behaviorally aggressive. As an example, he stated that when driving with Mr. DeMarco, if someone cuts him off or tailgates him, Mr. DeMarco remains calm and lets the other driver pass.

Dr. B. DeMarco reported that during the summer of 2025 he observed a change in Mr. DeMarco's mood. During trips to New York to sell a family property in

Buffalo, he noticed that Mr. DeMarco appeared more solemn and melancholy and would become tearful, which Dr. B. DeMarco described as unlike him. Mr. DeMarco reportedly told him that he was trying to adjust his medication and taper off to see whether the medication was contributing to his problems. Dr. B. DeMarco understood that the medication was being prescribed by Mr. DeMarco's primary care provider rather than a psychiatrist.

Around June or July 2025, according to Dr. B. DeMarco, Mr. DeMarco sent emails to family members apologizing and wanting to clear his conscience. He reportedly described himself as weepy and irritable during that period. When Dr. B. DeMarco returned from Buffalo in September 2025, Mr. DeMarco reportedly stated that his primary care provider had added a different medication, but that it was not working either. Dr. B. DeMarco stated that Mr. DeMarco still appeared to be feeling worse and described him as looking unkempt and unwell. Dr. B. DeMarco advised him to see a psychiatrist. Dr. B. DeMarco also reported that Mr. DeMarco had been reading news coverage and saw a story that he perceived as glorifying the murder of Charlie Kirk. This exacerbated his existing emotional vulnerabilities, per Dr. B. DeMarco. Dr. B. DeMarco described the instant situation as occurring in the context of depression, medication effects, increased drinking, self-medication, and an emotionally activating stimulus.

Mr. DeMarco's available medical records include cardiology/electrophysiology records from Emory Healthcare / Emory Clinic and Specialty, Emory Heart & Vascular clinic at St. Joseph's Hospital. The request form identified a date range of January 1, 2010 through May 22, 2026, while the clinical records provided primarily document care from February 2015 through July 2019. Those records indicate a history of paroxysmal atrial fibrillation, first noted in approximately 2014, as well as hyperlipidemia and a mildly dilated ascending aorta.

The Emory cardiology records indicate that Mr. DeMarco was treated medically for atrial fibrillation with medications including flecainide, metoprolol, and aspirin, and underwent monitoring and follow-up evaluations. Records and self-report indicate that he underwent catheter ablation for atrial fibrillation around 2017–2018, with subsequent follow-up documenting that he was doing well after the procedure. Subsequent follow-up notes document that he was doing well after ablation and reported no recurrent atrial fibrillation or palpitations. A July 2019 cardiology follow-up note indicated that he was approximately 18 months post-ablation, had no recurrence of atrial fibrillation, remained off antiarrhythmic medication, and had a CHADS-VASc score of 0. The records also document no known allergies, a history of ACL surgery, and family history significant for atrial fibrillation in his mother and sibling and stroke in his father.

Mr. DeMarco also reported a history of elevated cholesterol and long-term treatment with cholesterol medication. Mr. DeMarco also reported a history of elevated cholesterol and long-term cholesterol-management treatment, including Lipitor/atorvastatin or other lipid-lowering medication. He reported long-term cholesterol-management treatment.

Orthopedically, Mr. DeMarco reported a history of sports injuries and significant knee problems. He stated that he previously underwent ACL reconstruction in approximately 1994. He reported that he is preparing for bilateral knee replacement due to end-stage osteoarthritis. He reported that Dr. Hannah had previously been scheduled to perform a total knee replacement on his left knee on August 12, 2026, but that Mr. DeMarco had canceled the surgery. He stated that the earliest available follow-up appointment with Dr. Hannah was June 29, 2026, and that he expected to receive a letter from Dr. Hannah detailing the condition of both knees and the anticipated need for bilateral knee replacement surgery.

Mr. DeMarco also reported plantar fasciitis on both sides. He stated that his orthopedic problems have affected his functioning, including limiting his ability to continue some volunteer activities, such as work at a thrift store, due to knee pain.

**<u>LEGAL HISTORY</u>**

Mr. DeMarco's prior legal history appears limited and remote. The available Georgia/NCIC criminal history records identify two prior alcohol-related misdemeanor matters. Mr. DeMarco was forthcoming during the evaluation about these prior alcohol-related legal problems and described them consistently with the available records.

The first matter occurred on October 1, 1993, when Mr. DeMarco was arrested by the Atlanta Police Department for DUI. The case was handled in Atlanta Traffic Court and was ultimately dismissed on November 1, 1994.

The second matter occurred on August 1, 2010, following an incident dated July 31, 2010. Mr. DeMarco was arrested by the Georgia Department of Natural Resources for operation of a watercraft under the influence of alcohol. The matter proceeded in Hall County State Court, and resulted in a guilty adjudication on March 5, 2012. The sentence reportedly included 12 months of probation, 40 hours of community service, a $500 fine, and surcharges. Mr. DeMarco reported that he successfully completed probation and community service.

He did not report any other history of arrests, violence, supervision failures, or repeated criminal conduct. Collateral information from Dr. B. DeMarco was consistent with a limited and remote legal history. Dr. B. DeMarco did not

describe Mr. DeMarco as someone with a pattern of rule-breaking, aggression, intimidation, or antisocial behavior.

**Instant Offense Summary from Official Documentation**

According to an FBI FD-302, Officer Holligan of the Riviera Beach Police Department responded on September 19, 2025, regarding an electronic-threats incident. Officer Holligan met with school board member and attorney, Edwin Ferguson, who reported that his office received a threatening telephone call. Mr. Ferguson reported that his secretary answered the call, which appeared to come from a blocked or unknown number. The caller (not Mr. DeMarco) allegedly stated, *"I know where you live. I'm going to burn your house down."*

The FD-302 further states that later that same day, Mr. Ferguson received a second call that was answered by his automated voicemail system. This voicemail reportedly included racial slurs and a direct threat toward Mr. Ferguson. Mr. Ferguson reportedly did not recognize the voice and could not identify the caller.

The FD-302 indicates that on October 2, 2025, Mr. Ferguson returned to the Riviera Beach Police Department and met with Detective Jennifer Jones of the Strategic Investigations Division for a follow-up interview. During that interview, Mr. Ferguson reportedly reiterated the information previously provided to Officer Holligan. He also reported that he had received threats through Instagram. Mr. Ferguson reportedly provided screenshots of social-media threats and recordings of the voicemails left for him.

The report also describes a separate voicemail reportedly left on September 30, 2025. Detectives reportedly determined that this telephone number belonged to a man (Not Mr. DeMarco) in Daytona Beach, Florida. Detective Jones contacted Mr. McPherson by telephone. According to the FD-302, this man stated that he was displeased with Mr. Ferguson's comments about Charlie Kirk and wanted to communicate that to him. He reportedly clarified that he had referenced contacting the governor to have Mr. Ferguson removed from his elected position, denied threatening physical harm, and stated that he would avoid contacting Mr. Ferguson in the future.

Detectives reportedly attempted to contact the number belonging to Mr. DeMarco of Acworth, Georgia. Mr. DeMarco was reportedly not reached for an interview. His attorney at the time, Dominique Russo, returned the call on his behalf. According to the FD-302, Ms. Russo denied that any real threat had been made by Mr. DeMarco toward Mr. Ferguson. She reportedly stated that she opposed allowing her client to make a statement and expressed that she did not believe her client had made a credible threat. The report notes that Ms. Russo clarified

that these were her personal feelings and not necessarily Mr. DeMarco's thoughts or feelings.

**Mr. DeMarco's Statements About the Instant Offense –**

Mr. DeMarco was asked to share with this evaluator everything he remembered about the instant offense. The following are some of his statements:

*"Charlie Kirk came on my radar a couple of months before his assassination. He helped motivate me back to my religion and faith. So I felt I had a connection to him. Then came his assassination on stage. I saw an unedited version of his assassination. It was gory and horrible. I was deeply moved and cried. He was young, had a family and a wife. It was so sad."*

*"Mr. Ferguson was at a Palm Beach County School Board meeting and he disparaged Charlie. Mr. Ferguson said he was a racist, a bigot, and likened him to Hitler. I got the phone number to his law practice and used a racial slur and threatened to do bodily harm. I had no intention of doing anything to him. I was depressed, and not in my right mind."*

*"About 3 weeks later, a detective called and I called attorneys. But then it went overboard and they literally made a federal case out of it. I called Tyler DiMaio, my attorney now, and was distraught. I came down and we met. They took the case in October 2025. Tyler would reach out to me to stay in touch. Then on March 5, 2026 he called me and said there was an indictment. This is very scary. They put out a warrant, I flew down, they put me in cuffs, and shackles. The detective was very nice. Mr. Ferguson was at court. I am very remorseful. It was a 3 second voicemail that has forever changed my life. I got rid of all my weapons.*

*"I was on the phone call, again, for about 3 seconds. I called the school board when I was down in Florida visiting to see if he got fired, but he was an elected official. A lot of people called him and said bad things or made threats, but my voice was on there. I take full responsibility for what I did, regardless of whether or not other people did similar or worse things."*

*"Remorse is an understatement. I'm devastated over it. I put fear in him, and emotional distress. He was in fear for his life and I feel horrible. I threatened him with bodily harm, but I would have never done anything. I was just talking and had too much to drink and was upset about Charlie Kirk's murder and them constantly showing it online. This will never happen again. The media instigates and I was triggered by what I saw for Charlie Kirk, but I am responsible for what I said."*

*"I want to apologize to him, to Mr. Ferguson and to his family. I'm so remorseful. I see how he might have taken some of what Charlie Kirk said as bad and I can*

*see the other side and Mr. Ferguson also has a right to freely express his opinion."*

## PSYCHOLOGICAL TESTING:

### Mental Status Examination

Mr. DeMarco presented as a 65-year-old male who appeared his stated age. He was appropriately dressed and groomed for the evaluation. His hygiene appeared adequate, and there were no obvious abnormalities in gait, posture, or gross motor functioning observed during the interview. He was alert, cooperative, and generally responsive to the evaluation process. Rapport was adequately established, although his presentation was notable for underlying distress, embarrassment, and concern regarding the seriousness of the legal situation.

Mr. DeMarco was oriented to person, place, time, and situation. His level of consciousness was clear, and he appeared able to understand the nature and purpose of the evaluation. His attention and concentration were adequate for interview purposes. He was able to follow questions, remain on topic, and provide relevant responses. No significant receptive or expressive language deficits were observed. Speech was generally fluent, coherent, and goal-directed. Rate, rhythm, and volume were within normal limits, though his tone became more emotionally charged when discussing the pending case, his distress, and the consequences of his alleged behavior.

His mood was depressed and anxious. Affect was congruent with the content discussed and showed appropriate range, though it was constricted at times when he discussed shame, regret, legal stress, and his current life circumstances. He did not present as euphoric, expansive, labile in a manic manner, or grossly emotionally inappropriate. He appeared capable of experiencing remorse and concern regarding the impact of his behavior, while also appearing overwhelmed by the legal and personal consequences of the matter.

Thought processes were logical, coherent, and organized. There was no evidence of formal thought disorder, loose associations, flight of ideas, thought blocking, or grossly disorganized thinking. Thought content was notable for depressive themes, worry about the future, shame, regret, and preoccupation with the pending legal case. He did not endorse current homicidal intent, plan, or desire to harm the alleged victim or any other person during the evaluation. There was no evidence of delusional thinking, paranoia of psychotic proportion, hallucinations, or other symptoms suggestive of an active psychotic disorder. He did not present with manic symptoms, grandiosity, pressured speech, or decreased need for sleep suggestive of bipolar disorder.

Mr. DeMarco denied current suicidal intent or plan during the mental status

examination. However, this denial must be interpreted in the context of his MMPI-3 responses, which included endorsement of critical items reflecting suicidal/death ideation, including recent consideration of suicide. As such, while he did not present as imminently suicidal during the interview, the record supports the need for direct clinical follow-up regarding suicidal ideation, intent, plan, access to means, protective factors, and safety planning. His legal stress, depressive symptoms, alcohol-use history, and shame regarding the current matter are clinically relevant risk considerations, even in the absence of current stated intent.

There was no evidence during the interview that Mr. DeMarco was intoxicated or experiencing acute withdrawal. His sensorium appeared clear. He did not display tremor, slurred speech, confusion, or behavioral signs of acute substance impairment. Nevertheless, alcohol remains clinically relevant given his history of alcohol-related legal matters and the concern that alcohol may contribute to disinhibition, impaired judgment, anger expression, and poor coping under stress.

Insight appeared fair. Mr. DeMarco demonstrated some understanding that the alleged conduct was serious, inappropriate, and damaging. He appeared able to recognize that his emotional state, alcohol use, depression, boredom, and exposure to inflammatory media content may have contributed to poor judgment and impulsive verbal behavior. Judgment appeared fair in the structured evaluation setting but historically impaired in the context of emotional activation, alcohol-related disinhibition, and anger expression. His impulse control appeared adequate during the interview, though psychological testing suggests clinically relevant vulnerability to outward anger expression and difficulty calming or modulating anger once emotionally activated.

Cognitive functioning appeared grossly intact. His fund of information, verbal reasoning, and ability to describe historical events were consistent with his educational and occupational background. His memory for remote and recent events appeared adequate for interview purposes, although the accuracy of self-report should be considered alongside records, collateral information, and psychological testing. He did not display confusion, delirium, or neurocognitive impairment during the interview.

Interpersonally, Mr. DeMarco was polite and cooperative. He did not present as hostile, threatening, or aggressive during the evaluation. His demeanor was more consistent with a distressed, depressed, and legally overwhelmed individual than with someone who was actively menacing, predatory, or psychotic. He was able to participate meaningfully in the interview, respond to redirection, and discuss emotionally difficult material without behavioral escalation.

**<u>Minnesota Multiphasic Personality Inventory–3 (MMPI-3)</u>**

Synopsis

Mr. DeMarco produced a valid MMPI-3 protocol. Scores on the substantive scales indicate emotional dysfunction. The primary emotional/internalizing findings include suicidal ideation and a lack of positive emotional experiences.

Protocol Validity

Mr. DeMarco produced a valid MMPI-3 protocol. There were no problems with unscorable items. He responded to the items relevantly based on their content, and there were no indications of over-reporting or under-reporting.

Substantive Scale Interpretation

Mr. DeMarco's MMPI-3 results do not indicate significant somatic or cognitive dysfunction. There were also no indications of disordered thinking or maladaptive externalizing behavior.

The clinically significant findings were in the area of emotional dysfunction. While he denied any current suicidal ideation, Mr. DeMarco endorsed items reflecting a history of suicidal or death ideation and/or past suicide attempts. Based on these responses, he may be at risk for self-harm, may be preoccupied with suicide or death, and may be at risk for current suicidal ideation or attempts. He also endorsed a lack of positive emotional experiences and reduced interest, suggesting likely anhedonia. The interpersonal functioning scales provided no additional evidence of dysfunction.

**Miller Forensic Assessment of Symptoms Test (MFAST)**

The MFAST is a screening tool designed to help clinicians assess the likelihood that an individual is malingering psychiatric symptoms, particularly in forensic or legal settings. The MFAST includes items that tap into unlikely or atypical psychiatric symptoms, and assesses: Reported vs. observed inconsistencies, Rare symptom combinations, Extreme or improbable symptom descriptions, Cognitive symptoms that are not consistent with known disorders.

Mr. DeMarco's M-FAST score fell below the recommended cutoff for concern regarding feigned psychiatric symptoms. His responses did not suggest a pattern of exaggerated, unusual, or implausible symptom reporting on this measure. This finding is also consistent with the broader evaluation data. His reported

depression, anxiety, suicidal ideation, alcohol-related difficulties, and anger-regulation problems were generally consistent across interview, psychological testing, collateral information, and available records. He did not present with an exaggerated or theatrical description of psychosis, cognitive impairment, or bizarre psychiatric symptoms.

**State-Trait Anger Expression Inventory, Second Edition (STAXI-2)**

The STAXI-2 is designed to evaluate both temporary (state) and long-standing (trait) aspects of anger, as well as how individuals express or suppress anger, and how effectively they control it. It is widely used in clinical, forensic, and research settings to understand anger-related behavior, including in populations with violence risk.

Mr. DeMarco responded to all 57 items, and there were no missing responses. The STAXI-2 does not contain formal validity scales; therefore, the results should be interpreted as one source of information and considered in conjunction with clinical interview data, collateral information, records, behavioral history, and the circumstances of the evaluation.

Mr. DeMarco's State Anger score was in the low-moderate range. His three State Anger subscales were also in the low-moderate range, including State Anger/Feeling Angry, State Anger/Feel Like Expressing Anger Verbally, and State Anger/Feel Like Expressing Anger Physically. On the item-response summary, he endorsed the lowest response option for all 15 State Anger items. This pattern suggests that, at the time of testing, he was not reporting a high level of acute anger, irritation, rage, or immediate urges to express anger verbally or physically. In other words, the STAXI-2 did not suggest that he was acutely angry during the testing situation.

Mr. DeMarco's Trait Anger score was in the high range, indicating that he is more likely than many same-age male respondents to experience anger as a recurring or characteristic emotional response. His Trait Anger/Angry Temperament score was also in the high range. This suggests a tendency to become angry relatively quickly and with less situational provocation. His Trait Anger/Angry Reaction score was in the moderate range, suggesting that he may be sensitive to criticism, perceived unfairness, or frustration, but not necessarily prone to overreact in every situation involving criticism or negative feedback.

At the item level, Mr. DeMarco's Trait Anger responses were largely in the mild-to-moderate endorsement range, with one more elevated response on the final Trait Anger item. Specifically, he endorsed response option “2” on most Trait Anger items, response option “1” on one item, and response option “3” on one item. This pattern is consistent with a profile in which anger is not described as constantly extreme, but is sufficient to elevate the overall Trait Anger score.

Mr. DeMarco's Anger Expression-Out score was in the high range. This indicates a tendency to express anger outwardly toward other people or objects. In practical terms, this may involve verbal expressions of anger, sarcasm, hostile statements, blaming, threats, shouting, or other outward displays of frustration. His Anger Expression-In score was in the moderate range. This suggests that he suppresses or holds in anger about as much as most people.

Mr. DeMarco's Anger Control-Out score was in the low range. This is significant because it suggests limited perceived ability to monitor, restrain, or control the outward expression of anger once he becomes angry. His Anger Control-In score was also in the low range, suggesting difficulty calming himself internally, relaxing, or reducing angry feelings before they escalate. Taken together, these low anger-control scores suggest that Mr. DeMarco may have difficulty modulating anger both internally and externally, particularly under emotionally provocative circumstances.

The STAXI-2 results support recommendations for anger-management intervention, coping-skills training, and cognitively based treatment focused on identifying anger triggers, slowing escalation, increasing emotional awareness, improving frustration tolerance, and developing alternatives to hostile or threatening verbal expression. Given his history of cardiovascular problems, the health-related portion of the STAXI-2 report is also relevant. His high Trait Anger and high Anger Expression-Out scores may be associated with increased cardiovascular reactivity or stress-related health concerns, although these findings are correlational.

## RISK ASSESSMENT

### Historical-Clinical-Risk Management-20, Version 3 (HCR-20V3)

The HCR-20V3 was used as a structured professional judgment guide to organize factors relevant to Mr. DeMarco's risk for future interpersonal violence. The HCR-20V3 does not generate a purely actuarial probability estimate. Rather, it assists an evaluator in considering historical, current clinical, and future risk management factors; developing a case formulation; identifying plausible future risk scenarios; and considering interventions that may reduce risk.

HISTORICAL

1. History of Problems with Violence – Not Present/Low Relevance – The available records do not establish a history of physical violence, assaultive convictions, domestic violence, weapon use, or violent behavior toward others. The instant allegation involves threatening words communicated by telephone, but there is no current evidence of approach behavior, preparatory behavior, physical aggression, or actual violence. This factor is therefore rated not present,

with low relevance to actual physical violence.

2. History of Problems with Other Antisocial Behaviors – Not Present/Low Relevance – Mr. DeMarco's prior criminal history appears limited and dated. Records identify a 1993 DUI arrest that was dismissed and a 2010 boating-under-the-influence matter. These matters are alcohol-related and do not reflect a persistent antisocial lifestyle, repeated criminal versatility, or chronic disregard for the rights of others.

3. History of Problems with Relationships – Not Present/Low Relevance – Available information indicates that Mr. DeMarco is divorced, but the records reviewed do not establish a pattern of unstable, abusive, violent, or exploitative relationships. He appears to have family members who serve as supports. This factor is rated not present.

4. History of Problems with Employment – Not Present – Mr. DeMarco has a lengthy employment history in healthcare-related sales, business development, consulting, and hospital-management related work. He also completed a bachelor's degree at Florida State University and obtained a Lean Six Sigma certification. His occupational history appears to be a relative protective factor rather than a risk factor. This item is rated not present.

5. History of Problems with Substance Use – Partially Present/Moderate Relevance – Mr. DeMarco has two alcohol-related legal events in his background. The available record does not establish a severe or chronic substance use disorder, but alcohol use is clinically relevant because intoxication can lower inhibition, worsen judgment, increase emotional reactivity, and contribute to impulsive or inflammatory communication. This factor is rated partially present, with moderate relevance.

6. History of Problems with Major Mental Disorder – Partially Present/Low to Moderate Relevance – The available psychological testing does not indicate psychosis, mania, or disorganized thinking. However, MMPI-3 findings identified emotional/internalizing concerns, including suicidal/death ideation and lack of positive emotional experience or anhedonia. These findings warrant direct clinical follow-up, particularly regarding depression and suicide risk. At this time, the available data support emotional distress and depression rather than a major mental disorder clearly linked to violence risk. This factor is rated partially present, with low to moderate relevance.

7. History of Problems with Personality Disorder – Not Present/Low Relevance – There is insufficient evidence to conclude that Mr. DeMarco has a personality disorder. The STAXI-2 findings suggest anger-management vulnerabilities,

however, anger dysregulation alone does not establish a personality disorder. In the absence of evidence of a pervasive, longstanding personality disorder pattern, this factor is rated not present.

8. History of Problems with Traumatic Experiences – Not Present/Low Relevance The available records do not identify a history of significant trauma exposure, combat trauma, or other traumatic experiences relevant to violence risk. This factor is rated not present based on currently available information.

9. History of Problems with Violent Attitudes – Partially Present/Low to Moderate Relevance – The alleged voicemail included hostile, racially inflammatory, and threatening language. That language is concerning. However, the available record does not establish a stable ideology endorsing violence, race-based animus, a pattern of grievance-based pursuit, or an entrenched belief that violence is an acceptable means of resolving conflict. This factor is therefore rated partially present.

10. History of Problems with Treatment or Supervision Response – Not Present – There is no known history of repeated supervision violations, treatment refusal, failed probation, institutional misconduct, or inability to comply with court orders. The available records do not indicate that Mr. DeMarco violated supervision in connection with his prior alcohol-related case. This factor is rated not present.

CLINICAL

11. Recent Problems with Insight – Not Present/Low Relevance Counsel reportedly disputed that the alleged communication represented a real or credible threat, and there is no indication in the available records that Mr. DeMarco engaged in approach behavior or preparatory conduct. His insight was adequate in the MSE. This factor is rated not present, with low relevance.

12. Recent Problems with Violent Ideation or Intent – Partially Present/Low to Moderate Relevance – The instant allegation includes threatening words directed toward an identifiable person. However, the available records do not establish actual intent to carry out the threat, planning, weapon acquisition, travel toward the alleged victim, surveillance, or repeated pursuit. The available evidence therefore supports concern for threatening speech rather than demonstrated violent intent. This factor is rated partially present.

13. Recent Problems with Symptoms of Major Mental Disorder – Partially Present/Low to Moderate Relevance – Mr. DeMarco's MMPI-3 results identified suicidal/death ideation and anhedonia or reduced positive emotionality. These symptoms require direct clinical assessment and appropriate safety planning. This factor is rated partially present, with low relevance to violence risk against others, but higher relevance to self-harm.

14. Recent Problems with Instability – Partially Present/Low to Moderate Relevance – Mr. DeMarco is under significant legal stress, and testing suggests emotional distress and anger-regulation vulnerabilities. However, the available record does not show gross instability, repeated crises, homelessness, mania, psychosis, repeated aggression, or inability to function. This item is rated partially present, with low to moderate relevance.

15. Recent Problems with Treatment or Supervision Response – Not Present – There is no current evidence that Mr. DeMarco has violated bond conditions, refused treatment, violated court orders, or failed supervision. This factor is rated not present.

RISK MANAGEMENT

16. Future Problems with Professional Services and Plans – Partially Present/Low to Moderate Relevance – Professional services appear appropriate, particularly outpatient counseling focused on anger management, stress tolerance, alcohol-related risk reduction, and monitoring of depression or suicidal ideation. However, there is no indication that Mr. DeMarco requires inpatient treatment. This factor is rated partially present, with low to moderate relevance.

17. Future Problems with Living Situation – Not Present – Available records identify a stable residence in Acworth, Georgia. There is no evidence of homelessness, unstable housing, or a living situation likely to increase violence risk. This item is rated not present.

18. Future Problems with Personal Support – Not Present – Mr. DeMarco appears to have potential family support, including his brothers, both of whom are physicians, among others. At present, the available information suggests strong support rather than lack of support. This factor is rated not present.

19. Future Problems with Treatment or Supervision Response – Partially Present/Low Relevance – There is no established history of supervision failure. Future risk management should include clear no-contact conditions, avoidance of inflammatory communication, outpatient anger-management treatment, and monitoring of alcohol use. This factor is rated partially present.

20. Future Problems with Stress or Coping – Partially Present/Moderate Relevance – This is the most relevant future-oriented risk-management factor. Mr. DeMarco is facing serious legal stress, and psychological testing indicates anger-regulation problems, outward anger expression, low anger-control resources, suicidal/death ideation, and anhedonia. The available records do not establish a pattern of physical violence or follow-through on threats; however, stress, depression, alcohol-related disinhibition, and emotionally activating media exposure remain clinically relevant risk-management considerations.

SUMMARY

The HCR-20V3 formulation does not support characterizing Mr. DeMarco as presenting a high risk of imminent physical violence based on the information currently available. The primary risk concern is narrower and more situational. The available data suggest vulnerability to angry, impulsive, verbally threatening communication, particularly under conditions of stress, perceived grievance, emotional dysregulation, or possible alcohol-related disinhibition. Overall, Mr. DeMarco's risk for imminent physical violence appears low, provided he remains compliant with court orders, has no contact with the alleged victim, avoids alcohol-related disinhibition, and participates in appropriate outpatient treatment.

**CURRENT DSM-5-TR DIAGNOSTIC IMPRESSIONS**:

**F33.1 Major Depressive Disorder, Recurrent Episode, Moderate** — Mr. DeMarco's evaluation revealed significant emotional/internalizing distress, including suicidal/death ideation and reduced positive emotionality/anhedonia. His presentation is also notable for irritability, anger reactivity, low frustration tolerance, and difficulty modulating anger once emotionally activated. In an older adult male, depressive symptoms may present not only as sadness or tearfulness, but also as irritability, anger, emotional constriction, withdrawal, and reduced capacity to cope with stress.

**F10.11 Alcohol Use Disorder, Mild, in Early Remission** Mr. DeMarco's history includes alcohol-related legal matters, including a dismissed DUI arrest and a boating-under-the-influence conviction. The available information supports a mild alcohol-use diagnosis, particularly given the apparent relationship between alcohol use, impaired judgment, disinhibition, anger expression, and problematic conduct.

**CLINICAL ANALYSIS AND RISK MANAGEMENT CONSIDERATIONS**

Mr. DeMarco's alleged conduct can be best understood against the backdrop of a man who was already emotionally compromised before the instant offense occurred. He was retired, increasingly unstructured, bored, depressed, in the middle of medication change, and drinking alcohol. The available psychological testing supports clinically meaningful depressive symptoms, including anhedonia, reduced positive emotionality, and suicidal/death ideation. His anger testing further suggests that he is not necessarily acutely angry at baseline, but that he has a heightened tendency to become emotionally activated and to express anger verbally when provoked, particularly when he is under stress or disinhibited.

The alleged offense appears to have occurred in a narrow and emotionally charged context. Mr. DeMarco had reportedly been exposed repeatedly to

graphic, gory and inflammatory social-media content related to Charlie Kirk's assassination. That type of repeated exposure can function as an antecedent stimulus, or setting event especially for someone who is already depressed, isolated, drinking, and spending unstructured time online. The triggering material was then paired with a clip of the reported victim, a public figure and elected official himself, making highly critical comments about Charlie Kirk. The available information suggests that Mr. DeMarco reacted in an angry, emotionally dysregulated, and impulsive manner, leaving a very brief but threatening voicemail.

The words were offensive, racially inflammatory, and threatening. They were also the type of communication reasonably expected to cause fear and alarm. At the same time, a clinical risk formulation must distinguish between reprehensible language and actual intent or capacity to carry out violence. The available record does not show that Mr. DeMarco traveled toward the alleged victim, possessed or obtained a weapon for use against him, engaged in surveillance, made any approach efforts, recruited others, developed a plan, or took steps to carry out a threat. The behavior appears more consistent with a short-lived, intoxicated or disinhibited outburst of anger than with a sustained plan to cause physical harm.

In other words, the primary risk concern is not that Mr. DeMarco is a chronically violent person, but that under the wrong combination of depression, alcohol, perceived grievance, online provocation, and poor anger control, he engaged in inappropriate and threatening verbal behavior. The testing does not support psychosis, mania, delusional thinking, Antisocial Personality Disorder, or a fixed violent disposition.

Several other factors are clinically meaningful. Mr. DeMarco is an older adult with no violent criminal history. He has no known pattern of physical violence, no known history of stalking or approach behavior, and no known history of weapon-related violence. He has a long work history, a stable residence, medical vulnerabilities, family support, and treatment needs that are identifiable and manageable. His conduct appears to have emerged from a combination of depression, alcohol-related disinhibition, anger dysregulation, and inflammatory online exposure rather than from entrenched antisociality or a predatory motive. His risk for further hostile or threatening communication under conditions of stress, anger, or alcohol-related disinhibition is more clinically salient than his risk for imminent physical violence

Mr. DeMarco also appears to be a person who wants and is likely to benefit from treatment. His risk factors are dynamic and treatable. Depression can be treated. Alcohol-related disinhibition can be addressed through relapse-prevention planning and monitoring. Anger dysregulation can be treated through cognitive-behavioral anger management, coping-skills training, stimulus-control strategies, and structured behavioral planning. His unstructured retirement

routine can be modified through scheduled prosocial activity, treatment attendance, family accountability, and reduced exposure to provocative online material. Many of these proactive activities have already been started by Mr. DeMarco.

The suicide-related findings deserve particular attention. Mr. DeMarco denied current suicidal intent, but he endorsed MMPI-3 critical items reflecting suicidal/death ideation, including past consideration of suicide. Given that there is no acceptable amount of unaddressed suicide risk, a prudent plan would include direct follow-up assessment of current ideation, intent, plan, access to means, protective factors, and willingness to seek help. His brother and other supports should be educated about warning signs and should know who to contact if his mood worsens or if he becomes intoxicated, agitated, isolated, or hopeless.

Mr. DeMarco's risk is situational and dynamic, involving depression, alcohol-related disinhibition, anger dysregulation, legal stress, and exposure to emotionally activating media. These factors are clinically meaningful but treatable, and they are more closely associated with risk for impulsive hostile communication than with imminent physical violence.

**RECOMMENDATIONS:**

1. Mr. DeMarco should participate in individual counseling to address depression, legal stress, shame, adjustment to retirement, and coping with boredom, isolation, and emotionally activating media exposure. Treatment should also include maintenance and strengthening of anger-management skills, including identification of anger triggers, cognitive restructuring, impulse-control strategies, behavioral pause techniques, reduction of inflammatory online engagement, and development of more appropriate outlets for distress.

2. Mr. DeMarco should maintain sobriety and be linked with relapse-prevention supports. Given his history of alcohol-related legal problems and the concern that alcohol may contribute to disinhibition, poor judgment, emotional reactivity, and impulsive verbal behavior, he should abstain from alcohol or comply with any alcohol-monitoring condition imposed by the Court. Relapse-prevention work should include identification of high-risk situations, management of boredom and retirement-related unstructured time, refusal skills, accountability with family supports, and a written plan for what he will do if cravings, stress, anger, or depressive symptoms increase.

3. Mr. DeMarco should be referred for psychiatric medication evaluation and ongoing medication management for underlying depression. The purpose of this referral would be to determine whether antidepressant medication or other appropriate psychiatric intervention may assist with mood stabilization, anhedonia, irritability, sleep, anxiety, and stress tolerance. Medication

management should be coordinated with counseling and with his medical providers, particularly given his cardiac history.

4. Mr. DeMarco should maintain regular access to his primary support group, including his brothers and other appropriate family members. His support system should be incorporated into his risk-management and treatment plan when clinically appropriate. Family supports can assist with monitoring mood, encouraging sobriety, helping him maintain structure, reducing isolation, recognizing warning signs of depression or suicidal ideation, and encouraging immediate help-seeking if his emotional condition deteriorates.

5. In an abundance of caution, because Mr. DeMarco endorsed MMPI-3 items reflecting suicidal/death ideation, he should have a written safety plan with his treating providers. Although he denied current suicidal intent during the mental status examination, the prior endorsement of suicidal ideation warrants a practical plan that identifies warning signs, coping strategies, supportive contacts, emergency resources, and steps to reduce access to lethal means during periods of increased distress. His brother or another trusted support person should be aware of this plan.

*Thank you for the opportunity to evaluate Mr. DeMarco. If I can be of further assistance, please do not hesitate to contact me.*

.



**Sheila Rapa, Psy.D**, ATSAF, PA
Clinical and Forensic Psychologist
Fl License # PY6189

Bryan J. DeMarco, M.D.
2039 Stone Pointe Dr.
Kennesaw, Ga 30152
(770) 314-4871
bryjodm@aol.com
May 20, 2026

To the Honorable Donald M. Middlebrooks:

I am writing to you on behalf of my brother Henry Paul DeMarco, whom I have known for the past 65 years. I would like to be of help by giving you some background information on Paul's character, family support and community involvement.

Paul grew up in a moderate size family where both parents were active in his formative years. There were ups and downs mostly attributed to our father's struggle with an underlying anxiety/depression disorder. During his adult years, Paul has always showed compassion to people of all backgrounds and he is presently very active in his church's out reach program serving the under privileged in their community.

Paul unfortunately suffers from anxiety and depression which has become more noticeable over the last year. Different therapeutic options have been tried with varying success. He has personally expressed to me his extreme remorse and full responsibility for his actions.

Please take into consideration this background information when making your sentencing decision and know that Paul and the court will have the full support of me and his family during his rehabilitation process.
Please feel free to contact me if I can be of any further help.

Respectfully,

Bryan J. DeMarco

Thomas J. DeMarco, MD
921 Denmeade Walk SW
Marietta, GA 30064
678-656-1261
tdemarco921@gmail.com
May 22, 2026

To: The Honorable Donald M. Middlebrooks,

I am writing this letter in support of my brother Henry Paul DeMarco. I have known Paul his entire life, and he has always carried himself with respect and kindness.

He has been consistently generous, especially toward those who are less fortunate. I remember several examples of people he helped financially when they encountered hard times. He was always the first to offer assistance to his family in times of distress. He has given one of our sisters monthly financial assistance for many years.

Paul is active in his local church. He is a volunteer at St. Vincent de Paul; delivering food to needy families and helping to manage the food supply chain.

Paul's family will continue to be supportive of him throughout his sentencing and rehabilitation process.

Sincerely,

T. DeMarco

Thomas J. DeMarco

North Georgia Counseling Services LLC
Serving the community for over 15 years
www.ngacs.org

241 Lemon St, Suite B
Marietta, GA 30060

Ph: 678-354-5635
Fax: 678-354-5656

May 6, 2026

**Release Referral:** The Appropriate Authority

**Referral:** Mr. Paul DeMarco
SS#: xxx-xx-2721
DOB: 3/28/1961

## ASSESSMENT SUMMARY

Mr. DeMarco was seen on site at North Georgia Counseling for an Anger Management Evaluation and a Substance Abuse Evaluation. Mr. DeMarco appeared to be oriented as to person, place, time, and situation. His attitude was friendly, open, and appropriate for the presenting circumstances. Mr. DeMarco is a 64- year-old, divorced Caucasian male with a bachelor's degree. The process of this evaluation included a bio-psychosocial background interview with the client and an in-depth Anger Index questionnaire as well as personal information. This process assists in identifying the client's awareness of anger and their personal style of addressing it when confronted with a situation. He also was assessed for substance abuse issues using the same basic process.

**Current Living Environment:** Mr. DeMarco reported he lives alone in Acworth, Ga. He is currently not in a relationship and has no children.

**Family History:** Mr. DeMarco reported that his parents are deceased. He rated his childhood as "very good" and stated that he never witnessed or was the victim of any abuse. He reported no incidents of physical, emotional, or sexual abuse in his lifetime. He reported no family history of substance abuse issues.

**Medical History:** Mr. DeMarco reported no known history of mental illness in his family of origin. He denied any history of suicidal ideations or attempts, and none were suspected at this time. He stated that he is currently prescribed Zoloft for his diagnosed mild depression.

**Military History:** Mr. DeMarco reported no military history.

**Legal History:** Mr. DeMarco stated that he is currently under investigation for threatening voicemail. He admitted that he was under the influence of alcohol at the time of the alleged event. He did report a boating under the influence conviction in 2010. He reported no prior legal history.

**Employment History**: Mr. DeMarco is retired.

**Substance Abuse History:** Mr. DeMarco reported his 1st alcohol use was at age 19 and stated that from age 21 to 59 he consumed alcohol 2 x weekly; 2-3 drinks. At age 59 (retired) he increased his alcohol use to 4-5 x weekly;6-8 beers each episode. He reportedly used some marijuana in college and no reported use of any illicit drugs since then. He reported no alcohol use since early October 11, 2025, and verbally committed to remaining alcohol free.

## Anger Management Impression and Treatment Recommendations

Based on this client's self-reported information, his answers on the Anger Index and my clinical observations, Mr. DeMarco **does not appear** to be in need of conflict resolution education or intervention Mr. DeMarco scored in the mid-range on the Anger Index (18), which indicates that he does understand, identify and address his anger appropriately on most occasions but he would greatly benefit from 9 sessions of anger resolution counseling. This appears to be an isolated instance exasperated by alcohol use.

## Substance Abuse Impression and Recommendations

Mr. DeMarco **does meet** the criteria for alcohol use disorder-severe (in partial remission based on 7 months of continuous sobriety and active engagement in 12-step recovery and is diligently working the 12-step process with a sponsor. I have no recommendations for substance abuse counseling at this time. He has taken the appropriate action to address his alcoholism and presents a minimum risk for recidivism. I am confident that this incident would not have happened had he not been intoxicated at the time. If you have any questions regarding Mr. DeMarco, please feel free to contact me at your convenience.

Respectfully Submitted,

JJ Bremner CACII, CCS
Clinical Supervisor
North Georgia Counseling Services

North Georgia Counseling Services

241 Lemon Street, Suite B.• Marietta, Georgia 30060 • Tel: 678-354-5635 • Fax: 678-354-5636

## Anger Management Letter of Completion

November 20. 2025

This is to certify that: **Mr. Paul DeMarco**

Has completed **9** of his **9** recommended Anger Management sessions with North Georgia Counseling Services on November 20, 2025.

Mr. DeMarco remained engaged, transparent and exhibits a willingness to put into use the tools he has acquired throughout this learning process.

If you have any further questions, please feel free to contact me at your convenience.

Respectfully submitted,

Tracey Messer, CACI, CAMSII

Tracey Messer, CACI, CAMSII, CGS



North Georgia Counseling Services
241 Lemon Street, Suite B.• Marietta, Georgia 30060•Tel: 678-354-5635•Fax: 678-354-5636

May 7, 2026

To: Appropriate Court Authority

Regarding : Mr. Paul Demarco

The purpose of this letter is to document the progress that Mr. DeMrarco has made in his journey of recovery and the intense level of engagement that he has displayed. I am a person in long-term recovery (over 30 years) and a professional addiction counselor for over 25 years. I have been sponsoring Paul since October of 2025 and guided him through the completion of the 12 step process. He is now engaged in living the principles necessary in his daily life to maintain and grow in his recovery and stay committed to his goal of long-term sobriety. I believe his prognosis is excellent in obtaining that goal. Please fee free to contact me at your convenience for any additional information.

Respectfully;

JJ Bremner CACII, CCS
DBHDD State of Georgia Dui Interention Evaluator # 1590
Clinical Director

# North Georgia Counseling Services

241 Lemon Street, Suite B.• Marietta, Georgia 30060 • Tel: 678-354-5635 • Fax: 678-354-5636

I Henry Paul DeMarco hereby give permission to North Georgia Counseling Services to disclose information regarding results of the witnessed drug screen to the designated referral named below and hereby release the staff of NGACS from any and all potential liability's resulting from the drug screen results. This release will remain in effect for one year.

Release Referral: Tyler@Suskauer.com

Phone 772-480-4443 Fax ____

Client states that he/she is currently using legally prescribed / over the counter medications and adhering to the recommended dosages of the following;

______

Sample presented within acceptable temperature range; 90-100 degrees F Yes X No__

Multiple Adulteration Strip Chemistry test performed: yes X No____

Creatinine____ Specific Gravity____ pH____ Nitrites____ Oxidants____

| Urine analyzed for the following drugs | | | Cut off levels |
|---|---|---|---|
| Marijuana | Positive ____ | Negative____ | 50 ng/ml |
| Cocaine | Positive ____ | Negative____ | 150 ng/ml |
| Opiates | Positive ____ | Negative____ | 300 ng/ml |
| Methamphetamine | Positive____ | Negative ____ | 1000ng/ml |
| Benzodiazepines | Positive____ | Negative____ | 300ng/ml |
| Oxycodone | Positive____ | Negative____ | 100 ng/ml |
| Methadone | Positive-____ | Negative ____ | 300 ng/ml |
| MDMA | Positive____ | Negative ____ | 500 ng/ml |
| PCP | Positive____ | Negative ____ | 25 ng/ml |
| Barbiturates | Positive ____ | Negative____ | 300 ng/ml |
| Amphetamines | Positive ____ | Negative____ | 1000ng/ml |
| Buprenorphine | Positive ____ | Negative____ | 10 ng/ml |
| Alcohol EtG ____ | Positive ------------ | Negative-[initials]----- | 300ng 72 hour window |

Signature [signature] Date 11/13/25

Tested By Tracey Meeren, NCAC I, CAC I, CAMS II, CGS Date 11/13/25

North Georgia Counseling Services
241 Lemon Street, Suite B.• Marietta, Georgia 30060 • Tel: 678-354-5635 • Fax: 678-354-5636

I Henry Paul DeMarco hereby give permission to North Georgia Counseling Services to disclose information regarding results of the witnessed drug screen to the designated referral named below and hereby release the staff of NGACS from any and all potential liability's resulting from the drug screen results. This release will remain in effect for one year.

Release Referral: Tyler@sLsKauer.com

Phone ~~404-444-4~~ 772-480-4443 Fax ____

Client states that he/she is currently using legally prescribed / over the counter medications and adhering to the recommended dosages of the following;

____

Sample presented within acceptable temperature range; 90-100 degrees F Yes__ No__

| Urine analyzed for the following drugs | | | Cut off levels |
|---|---|---|---|
| Marijuana | Positive ____ | Negative ____ | 50 ng/ml |
| Cocaine | Positive ____ | Negative ____ | 150 ng/ml |
| Opiates | Positive ____ | Negative ____ | 300 ng/ml |
| Methamphetamine | Positive ____ | Negative ____ | 1000ng/ml |
| Benzodiazepines | Positive ____ | Negative ____ | 300ng/ml |
| Oxycodone | Positive ____ | Negative ____ | 100 ng/ml |
| Methadone | Positive- ____ | Negative ____ | 300 ng/ml |
| MDMA | Positive ____ | Negative ____ | 500 ng/ml |
| PCP | Positive ____ | Negative ____ | 25 ng/ml |
| Barbiturates | Positive ____ | Negative ____ | 300 ng/ml |
| Amphetamines | Positive ____ | Negative ____ | 1000ng/ml |
| Buprenorphine | Positive ____ | Negative ____ | 10 ng/ml |
| Alcohol ETG | Positive ------------ | Negative SM | 300ng 72 hour window |
| Fentanyl | Positive ____ | Negative ____ | 100mg/ml |

Signature [signature] Date 11/24/25

Tested By Stacey Mason Date 11/20/25

# North Georgia Counseling Services

241 Lemon Street, Suite B.◦ Marietta, Georgia 30060

North Georgia Counseling Services
Tracey Messer CAC I, CAMS II, CGS
Certified Addiction Counselor
Certified Anger Management Specialist
Certified Grief Specialist
241 Lemon Street, Suite B
Marietta, Georgia 30060
Tel: 678-354-5635
Fax: 678-354-5636

I Paul DeMarco hereby give

Services to disclose information regarding results of the witnessed drug screen to the designated referral named below and hereby release the staff of NGACS from any and all potential liability's resulting from the drug screen results. This release will remain in effect for one year.

Release Referral: Tyler DiMaio Tyler@suskauer.com

Phone 772-480-4443 Fax →

Client states that he/she is currently using legally prescribed / over the counter medications and adhering to the recommended dosages of the following;

______________________________

*Sample presented within acceptable temperature range; 90-100 degrees F Yes__ No__*

| Urine analyzed for the following drugs | | | Cut off levels |
|---|---|---|---|
| Marijuana | Positive ______ | Negative SM | 50 ng/ml |
| Cocaine | Positive ______ | Negative SM | 150 ng/ml |
| Opiates | Positive ______ | Negative SM | 300 ng/ml |
| Methamphetamine | Positive ______ | Negative SM | 1000ng/ml |
| Benzodiazepines | Positive ______ | Negative SM | 300ng/ml |
| Oxycodone | Positive ______ | Negative SM | 100 ng/ml |
| Methadone | Positive- ______ | Negative SM | 300 ng/ml |
| MDMA | Positive ______ | Negative SM | 500 ng/ml |
| PCP | Positive ______ | Negative SM | 25 ng/ml |
| Barbiturates | Positive ______ | Negative SM | 300 ng/ml |
| Amphetamines | Positive ______ | Negative SM | 1000ng/ml |
| Buprenorphine | Positive ______ | Negative SM | 10 ng/ml |
| Alcohol ETG | Positive ------------ | Negative SM | 300ng 72 hour window |
| Fentanyl | Positive ______ | Negative SM | 100mg/ml |

Signature [signature] Date 2/3/26

Tested By Ms. Tracey Messer Date 2/3/26

North Georgia Counseling Services

www.ngacs.org

North Georgia Counseling Services

241 Lemon Street, Suite B. Marietta, Georgia 30060 - T

North Georgia Counseling Services

Tracey Messer CAC I, CAMS II, CGS

Certified Addiction Counselor
Certified Anger Management Specialist
Certified Grief Specialist

241 Lemon Street, Suite B
Marietta, Georgia 30060
Tel: 678-354-5635
Fax: 678-354-5636

I Paul DeMarco hereby give p... Services to disclose information regarding results of the witnessed drug screen to the designated referral named below and hereby release the staff of NGACS from any and all potential liability's resulting from the drug screen results. This release will remain in effect for one year.

Release Referral: Tyler@Suskaver.com

Phone 772-480-4443 Fax ____________

Client states that he/she is currently using legally prescribed / over the counter medications and adhering to the recommended dosages of the following;

____________________________________________

*Sample presented within acceptable temperature range; 90-100 degrees F Yes__ No__*

| Urine analyzed for the following drugs | Positive | Negative | Cut off levels |
|---|---|---|---|
| Marijuana | | | 50 ng/ml |
| Cocaine | | | 150 ng/ml |
| Opiates | | | 300 ng/ml |
| Methamphetamine | | | 1000ng/ml |
| Benzodiazepines | | | 300ng/ml |
| Oxycodone | | | 100 ng/ml |
| Methadone | | | 300 ng/ml |
| MDMA | | | 500 ng/ml |
| PCP | | | 25 ng/ml |
| Barbiturates | | | 300 ng/ml |
| Amphetamines | | | 1000ng/ml |
| Buprenorphine | | | 10 ng/ml |
| Alcohol ETG | | | 300ng 72 hour window |
| Fentanyl | | | 100mg/ml |

gnature ____________ Date 4/22/26

sted By Tracey Messer, NCACI, CACI CAMSII, CGS Date 4/22/26

North Georgia Counseling Services
241 Lemon Street, Suite B.- Marietta, Georgia 30060 - Tel: 678-354-5635 - Fax: 678-354-56:

I Henry Paul DeMarco hereby give permission to North Georgia Counseling Services to disclose information regarding results of the witnessed drug screen to the designated referral named below and hereby release the staff of NGACS from any and all potential liability's resulting from the drug screen results. This release will remain in effect for one year.

Copy

Release Referral: Tyler@SusKaver.com

Phone ______ Fax ______

Client states that he/she is currently using legally prescribed / over the counter medications and adhering to the recommended dosages of the following;
None

| Urine analyzed for the following drugs | Positive | Negative | Cut off levels |
|---|---|---|---|
| Marijuana | | ✓ | 50 ng/ml |
| Cocaine | | ✓ | 150 ng/ml |
| Opiates | | ✓ | 300 ng/ml |
| Methamphetamine | | ✓ | 1000ng/ml |
| Benzodiazepines | | ✓ | 300ng/ml |
| Oxycodone | | ✓ | 100 ng/ml |
| Methadone | | ✓ | 300 ng/ml |
| MDMA | | ✓ | 500 ng/ml |
| PCP | | ✓ | 25 ng/ml |
| Barbiturates | | ✓ | 300 ng/ml |
| Amphetamines | | ✓ | 1000ng/ml |
| Buprenorphine | | ✓ | 10 ng/ml |
| Alcohol Etg | | ✓ | 300ng -72 hour window |
| Fentanyl | | ✓ | 100mg/ml |

Signature Henry Paul DeMarco Date 6/17/2026

Tested By [signature] LMCII, CCS Date 6/17/2026

# North Georgia Counseling Services

241 Lemon Street, Suite B.- Marietta, Georgia 30060 - Tel: 678-354-5635 - Fax: 678-354-5636

I Henry Paul DeMarco hereby give permission to North Georgia Counseling Services to disclose information regarding results of the witnessed drug screen to the designated referral named below and hereby release the staff of NGACS from any and all potential liability's resulting from the drug screen results. This release will remain in effect for one year.

Release Referral: Tyler @ suskauer.com

Phone 772-480-4443 Fax ______

Client states that he/she is currently using legally prescribed / over the counter medications and adhering to the recommended dosages of the following;

______

| Urine analyzed for the following drugs | | | Cut off levels |
|---|---|---|---|
| Marijuana | Positive ______ | Negative (initialed) | 50 ng/ml |
| Cocaine | Positive ______ | Negative (initialed) | 150 ng/ml |
| Opiates | Positive ______ | Negative (initialed) | 300 ng/ml |
| Methamphetamine | Positive ______ | Negative (initialed) | 1000ng/ml |
| Benzodiazepines | Positive ______ | Negative (initialed) | 300ng/ml |
| Oxycodone | Positive ______ | Negative (initialed) | 100 ng/ml |
| Methadone | Positive- ______ | Negative (initialed) | 300 ng/ml |
| MDMA | Positive ______ | Negative (initialed) | 500 ng/ml |
| PCP | Positive ______ | Negative (initialed) | 25 ng/ml |
| Barbiturates | Positive ______ | Negative (initialed) | 300 ng/ml |
| Amphetamines | Positive ______ | Negative (initialed) | 1000ng/ml |
| Buprenorphine | Positive ______ | Negative (initialed) | 10 ng/ml |
| Alcohol Etg | Positive ----------- | Negative-- (initialed) | 300ng -72 hour window |
| Fentanyl | Positive ______ | Negative (initialed) | 100mg/ml |

Signature Henry Paul DeMarco Date 7/9/26

Tested By Tracey Mason, CACI, CAMS II Date 7/9/26

______

www.ngacs.org

North Georgia Counseling Services

241 Lemon Street, Suite B.- Marietta, Georgia 30060 - Tel: 678-354-5635 - Fax: 678-354-5636

I Paul DeMarco hereby give permission to North Georgia Counseling Services to disclose information regarding results of the witnessed drug screen to the designated referral named below and hereby release the staff of NGACS from any and all potential liability's resulting from the drug screen results. This release will remain in effect for one year.

Release Referral: Tyler @ suskauer, com

Phone ______ Fax ______

Client states that he/she is currently using legally prescribed / over the counter medications and adhering to the recommended dosages of the following;

______

Sample presented within acceptable temperature range; 90-100 degrees F Yes X No__

| Urine analyzed for the following drugs | | | Cut off levels |
|---|---|---|---|
| Marijuana | Positive ______ | Negative [initials] | 50 ng/ml |
| Cocaine | Positive ______ | Negative [initials] | 150 ng/ml |
| Opiates | Positive ______ | Negative [initials] | 300 ng/ml |
| Methamphetamine | Positive ______ | Negative [initials] | 1000ng/ml |
| Benzodiazepines | Positive ______ | Negative [initials] | 300ng/ml |
| Oxycodone | Positive ______ | Negative [initials] | 100 ng/ml |
| Methadone | Positive- ______ | Negative [initials] | 300 ng/ml |
| MDMA | Positive ______ | Negative [initials] | 500 ng/ml |
| PCP | Positive ______ | Negative [initials] | 25 ng/ml |
| Barbiturates | Positive ______ | Negative [initials] | 300 ng/ml |
| Amphetamines | Positive ______ | Negative [initials] | 1000ng/ml |
| Buprenorphine | Positive ______ | Negative [initials] | 10 ng/ml |
| Alcohol ETG | Positive ------------ | Negative [initials] | 300ng 72 hour window |
| Fentanyl | Positive ______ | Negative [initials] | 100mg/ml |

Signature [signature] Date 8/27/26

Tested By Tracey Messon, CACI, CAMS II Date 8/27/26

**Society of St. Vincent de Paul**
of St Clare of Assisi Catholic Church
6301 Cedarcrest Road
Acworth, GA 30101



To Whom it May Concern

Subject: Volunteer Work

June 25, 2026

Please accept this letter as proof of service from one of our Volunteers, Paul DeMarco. Paul volunteered for the following assignments:

Pantry – Frozen meat pickup at the SVdP Thrift Store and returned to the Food Pantry for distribution to clients on the following dates: 4/6/26, 5/4/26, 5/18/26, 6/1/26, 6/15/26 – 2 hours each trip – 10 hours total.

Pantry – Food delivery with Linda H – 2 hours

Thrift Store – working on electronics cleaning/repair and testing – 2 hours

Total hours worked – 14 hours.

Thank you for your help,

Deborah L. Green
Secretary – Society of St Vincent de Paul
St. Clare Conference
678-592-0047

**Society of St. Vincent de Paul**
of St Clare of Assisi Catholic Church
6301 Cedarcrest Road
Acworth, GA 30101



To Whom it May Concern

Subject: Volunteer Work

July 31, 2026

Please accept this letter as proof of service from one of our Volunteers, Paul DeMarco. Paul volunteered for the following assignments during July 2026:

Pantry – Clean up/pest control 7/1/26 – 2 hours, 7 miles

Food Bag Filer 7/8/26 – 2 hours, 7 miles

Bread Pickup – 7/11, 7/18, 7/25 – 2 hours each, 20 miles each, 6 hours total, 60 miles.

Frozen Meat Pickup – 7/13, 7/20, 7/27 – 2 hours each, 15 miles each, 6 hours total, 45 miles

Total hours worked – 16 hours, 119 miles.

Thank you for your help,

Deborah L. Green
Secretary – Society of St Vincent de Paul
St. Clare Conference
678-592-0047

Bass Pro Shops

Outdoor World

Store Phone 470-315-7500

Now Hiring Full Time

And Part Time Positions

REFUND TRANSACTION

| | |
|---|---|
| Item Refunded - Used Gun Purchase | |
| PISTOL | -$315.00 |
| 09000012398136 | |
| Serial number - REA025906 | |
| Item Refunded - Used Gun Purchase | |
| PISTOL | -$175.00 |
| 09000012398143 | |
| Serial number - ABG711309 | |
| Item Refunded - Used Gun Purchase | |
| PISTOL | -$245.00 |
| 09000012398150 | |
| Serial number - 2580789 | |
| Item Refunded - Used Gun Purchase | |
| PISTOL | -$245.00 |
| 09000012398167 | |
| Serial number - BC0175 | |
| Item Refunded - Used Gun Purchase | |
| PISTOL | -$420.00 |
| 09000012398174 | |
| Serial number - FDD4513 | |
| Item Refunded - Used Gun Purchase | |
| RIFLE | -$490.00 |
| 09000012398181 | |
| Serial number - 1852-44290 | |
| Item Refunded - Used Gun Purchase | |
| RIFLE | -$770.00 |
| 09000012398198 | |
| Serial number - 16-014728A | |
| Refund due | -$2,660.00 |
| Used Gun Purchase Check | -$2,660.00 |

Visit basspro.com/feedback. Tell us how we did for a chance to win a $500 gift card. NO PURCHASE NECESSARY. Open to US and Canada 18+. Void in RI, Quebec and where prohibited. See website for rules/details. To give us feedback scan the QR Code using the Camera app on your phone

Keep In Touch!

Facebook.com/BassProShops

Twitter.com/BassProShops

Youtube.com/BassProShops

Basspro.com/email

Basspro.com/app

YOU WERE SERVED TODAY BY White B

| STORE | TILL | OP NO. | TRANS | DATE | TIME |
|---|---|---|---|---|---|
| 0457 | 310 | 1067862 | 50148 | 10-03-25 | 14:39 |

BPS02045703100050-K36

SAVE ON GEAR & SUPPORT CONSERVATION

JOIN THE CLUB TODAY!

# Retail Firearm

Cabela's

Seller Information – All States

Name: HENRY PAUL DEMARCO
Address: 4113 MARS BAY
DOB: 03/28/1961 Age: 64
State/Gov Photo ID: GA 037226230
State ID Exp: 03/28/2029

FFL #

City: ACWORTH
State: GA
Zip: 30101-4909
Phone: 4044444756

Acquire Date: 10/03/2025
Time Of Transaction: October 03, 2025 13:26 CT
Additional Information Required For : AK, CO, NC, OR, WI

Height: Weight: Hair Color: Sex: Race:

Employee: Barry White
Store #: 457 Store Location: Acworth
Purchase Or Trade: Purchase
Purchase Method: Check
Check #: 131987
Number of Guns: 7

Customer Fingerprint (where required by law)

Seller Certification:
By my signature below I hereby certify that all my personal information, provided by me, on this form is true and correct. I certify that all firearms contemplated herein are free from material defect(s), and have not been illegally modified. I certify that I have full legal right and authority to possess, sell, trade or convey the firearm(s) listed herein to Bass Pro Shops / Cabela's. Further, I expressly agree that if any firearm I sell to Bass Pro Shops/Cabela's pursuant to this agreement is seized by a government authority on the allegation it is evidence of a crime, or is subject to any other third party claim of superior title while in Bass Pro Shops / Cabela's possession resulting in Bass Pro Shops / Cabela's loss of ownership rights, that I shall reimburse Bass Pro Shops / Cabela's for its purchase price along with any and all fees and/or expenses related thereto, including reasonable legal fees, immediately upon Bass Pro Shops / Cabela's request.

Seller's Signature: Henry Paul DeMarco 10/3/25 Date:

| Manufacturer | Importer | Model | Type | Caliber/Gauge | Cost |
|---|---|---|---|---|---|
| TAURUS ARMAS | TAURUS | 1911 | PISTOL | 9MM LUGER | $ 315.00 |
| Serial Number : AEA025906 | | UPC: 900012398136 | | | |
| TAURUS ARMAS | TAURUS | G3C | PISTOL | 9MM LUGER | $ 175.00 |
| Serial Number : ABG711309 | | UPC: 900012398143 | | | |
| KELTEC | | P15 | PISTOL | 9MM LUGER | $ 245.00 |
| Serial Number : 2580789 | | UPC: 900012398150 | | | |



Reference DEM00321664

Total Cost:2660.00

| Manufacturer | Importer | Model | Type | Caliber/Gauge | Cost |
| --- | --- | --- | --- | --- | --- |
| CARL WALTHER | WALTHER ARMS | PPS | PISTOL | 9MM LUGER | $ 245.00 |
| Serial Number : BC0175 | | | UPC: 900012398167 | | |
| CARL WALTHER | WALTHER ARMS | PDP | PISTOL | 9MM LUGER | $ 420.00 |
| Serial Number : FDC4513 | | | UPC: 900012398174 | | |
| RUGER | | AR-556 | RIFLE | 5.56 NATO | $ 490.00 |
| Serial Number : 1852-44290 | | | UPC: 900012398181 | | |
| ARMALITE | | M15 | RIFLE | 5.56 NATO | $ 770.00 |
| Serial Number : 15-014728A | | | UPC: 900012398198 | | |



Reference DEM00321664

Total Cost:2660.00